# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| HENRY G. FIORENTINI, ) | |
| ) | |
| Plaintiff, ) | Case No. 15 CV 3292 |
| ) | |
| v. ) | Judge Charles R. Norgle |
| ) | |
| PAUL REVERE LIFE INSURANCE ) | |
| COMPANY, a Massachusetts Corporation, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Henry G. Fiorentini ("Plaintiff") sues Defendant Paul Revere Life Insurance Company ("Defendant") for terminating Plaintiff's Total Disability benefits. Plaintiff brings claims for breach of contract, unreasonable and vexatious conduct under 215 Ill. Comp. Stat. § 5/155, and an action for declaratory relief. Before the Court are the Parties' cross-motions for summary judgment. For the reasons set forth below, Plaintiff's motion is denied and Defendant's motion is granted.

## I. BACKGROUND

Plaintiff founded Panatech Computer Management, Inc. ("Panatech") in 1982 after graduating with a joint bachelor's and master's degree in Electrical Engineering and Computer Science from M.I.T. and an MBA from the University of Chicago. Panatech provides customized accounting software to small businesses and bundles hardware maintenance contracts with the software. Plaintiff has been the president and owner of Panatech since its inception in 1982.

In September 1988, Plaintiff submitted an application for disability insurance to Defendant and listed his occupation as president and owner of Panatech. In October 1988, Defendant issued Plaintiff Disability Policy Number: 0102363772 (the "Policy"). The Policy provided total disability and residual disability benefits. Under the Policy, Total Disability "means that because of Injury or Sickness: You are unable to perform the important duties of Your Occupation; and You are under the

regular and personal care of a Physician." Plaintiff's Response to Defendants LR 56.1 Statement of Material Facts (hereinafter, "PRDSF") ¶ 3. Under the Policy, Residual Disability means "You are unable to perform one or more of the important duties of Your Occupation; or You are unable to perform the important duties of Your Occupation for more than 80% of the time normally required to perform them; and Your loss of Earnings is equal to at least 20% of Your Prior Earnings while You are engaged in Your Occupation or another occupation; and You are under the regular and personal care of a Physician." Id. at ¶ 4. The Policy further provides that "'Your Occupation' means the occupation in which You are regularly engaged at the time You become Disabled." Id. at ¶ 5.

In 1998, Plaintiff was diagnosed with an invasive basal cell carcinoma of the right ear, which is a common form of skin cancer. Plaintiff subsequently underwent a number of minor outpatient surgeries, which failed to completely remove the cancer. On July 9, 2008, Plaintiff underwent major surgery (the "Surgery") resulting in the removal of his entire right ear and a portion of the right side of his head. Over the course of the following twelve months, Plaintiff underwent radiation treatment and had several more surgeries. During these additional surgeries, Plaintiff had three metal posts installed in the right side of his head for the purpose of mounting a prosthetic ear. By the end of his radiation treatment in 2009, there was "no evidence" that the cancer had returned. PRDSF at ¶ 23. Plaintiff also began wearing a prosthetic ear, which he admits is "virtually indistinguishable" from his left ear, leaving him "free of significant disfiguration." Id. at ¶¶ 23-24. However, following Plaintiff's surgeries and treatment he has been affected by various ailments, including complete hearing loss in the right ear, difficulty in localizing sounds, tinnitus, fatigue, dry mouth, and migraines.

On November 6, 2008, Plaintiff submitted a claim to Defendant for payment of disability benefits under the Policy (the "Claim"). The Claim included a written job description, which identified Plaintiff's job title as "President, Panatech Computers Management, Inc.," and listed four duties of his occupation, in order of importance: "Sales, 6-8 hours per week; Consulting/meetings, 7-

2

10 hours per week; Programming, 15-25 hours per week; and Administrative, 2-3 hours per week." PRDSF ¶ 15. Plaintiff's Claim stated that he did not work at all for "2-3 [weeks] after each surgery" and that he began working part time in late July 2008 for approximately 5-10 hours per week, including "approving payroll, payables, bills" for 1-2 hours per week; "customer contact [with] existing customers" for 1-2 hours per week; and fixing minor bugs in existing programs" for 2-3 hours per week. Id. at ¶ 16.

In February 2009, Defendant began paying Plaintiff Total Disability benefits and continued monitoring his condition though annual medical updates and claim statements. From 2010 to 2013, Plaintiff reported to Defendant that his condition was "unchanged" or "worse," and he was "not sure how long he will continue to work." Id. at ¶¶ 18-22. In February 2013, Plaintiff reported to Defendant that he was working 10-20 hours per week and that he was "working to keep migraines under control." Id. at ¶ 22. In December, 2013, Plaintiff reported to Defendant that he was continuing to work 10-20 hours per week and that he spends his day performing work "which involves calling clients, programming, and work related paperwork." Id. at ¶ 25. In 2013-2014, Plaintiff billed clients an average of 15.35 hours per week for programming work, as compared to 15.63 hours per week prior to the Surgery.

Following Plaintiff's Surgery and treatment, he has been able to communicate with clients via text, email, phone, and face to face meetings. Plaintiff has also been able to visit client job sites on a weekly basis to discuss and resolve computer problems. Id. at ¶ 29. Panatech, however, has not acquired any new clients since 2008, and has billed significantly fewer clients since that time. Panatech's 2013-2014 Federal Income Tax Returns show an average gross profit of $256,094, down approximately 20 percent from its 2006-2007 average gross profit of $322,202.

While Plaintiff continued to report to Defendant that he was totally disabled, he was able to partake in a number of extracurricular activities. In 2013, Plaintiff renewed his pilot's license, originally obtained in the mid-1980s, and purchased an airplane. Plaintiff spends between 75-80

3

hours per year flying his plane to different locations in the Midwest, mostly to have breakfast with other flying enthusiasts. In May 2013, Plaintiff presented a 90 minute speaking seminar on ForeFlight, an iPad application used by pilots. In June 2013, Plaintiff published a book about the Foreflight application. In December 2013, Plaintiff reported to Defendant that he was playing in an adult ice hockey league once per week.

In 2013, a new claims representative, Mary Kate Thorpe ("Thorpe"), reviewed Plaintiff's file. Thorpe ordered surveillance, spoke with Plaintiff on the telephone, and sent a representative to conduct an on-site meeting with Plaintiff in December 2013. Thereafter, Defendant decided to cease payment of Plaintiff's Total Disability benefits. In a letter from Defendant to Plaintiff, dated March 4, 2014, Defendant stated: "Based on the information in your claim file you are able to perform important duties of your occupation as President of Panatech Computer Management, Inc. Accordingly, we find you do not satisfy the policy definition for Total Disability. We recognize, due to your Sickness you may experience a loss of earnings. If you are experiencing a loss of 20% or more of your prior earnings you may qualify for Residual Disability benefits." PRDSF ¶ 50. The letter also requested financial documents to calculate whether Plaintiff was entitled to Residual Disability benefits. Plaintiff never submitted the requested documents, but rather insisted on payment of Total Disability benefits.

After receiving Defendant's letter, Plaintiff wrote at least 14 letters to Defendant, the Illinois Department of Insurance, and the Illinois House of Representatives, stating that he disagreed with Defendant's determination that he did not satisfy the Policy's definition of Total Disability. In these letters, Plaintiff disputed Defendant's position, argued the facts of his case, and made legal arguments in support of his position. Plaintiff stopped paying premiums and the Policy lapsed on December 1, 2014. On July 26, 2016, the parties filed a written and signed Stipulation in which Plaintiff waived "any claim to payment of benefits for Residual Disability under the Policy." Stipulation Regarding Residual Disability Benefits, Dkt. No. 33.

## II. DISCUSSION

### A. Standard of Review

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Northfield Ins. Co. v. City of Waukegan, 701 F.3d 1124, 1128 (7th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Wells v. Coker, 707 F.3d 756, 760 (7th Cir. 2013) (internal quotation marks and citation omitted). "On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." Payne v. Pauley, 337 F.3d 767, 770 (7th Cir. 2003) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). The Court must view "the record in the light most favorable to the nonmovant and [avoid] the temptation to decide which party's version of the facts is more likely true." Id.

Where parties file cross-motions for summary judgment, the standard of decision does not change. Selective Ins. Co. of S.C. v. Target Corp., 845 F.3d 263, 265 (7th Cir. 2016), as amended (Jan. 25, 2017). The Court "take[s] the motions one at a time," Black Earth Meat Mkt., LLC v. Vill. of Black Earth, 834 F.3d 841, 847 (7th Cir. 2016), and "construe[s] all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." Target Corp., 845 F.3d at 265 (internal quotation and citation omitted).

### B. Plaintiff Does Not Satisfy the Policy's Definition of Total Disability

The dispositive issue in this case is whether Plaintiff satisfies the Policy's definition of Total Disability, starting when Defendant terminated Plaintiff's Total Disability benefits in 2014. The interpretation of an insurance policy is a question of law. Netherlands Ins. Co. v. Phusion Projects, Inc., 737 F.3d 1174, 1177 (7th Cir. 2013). Thus, when the material facts are not in dispute, the

interpretation of an insurance policy may be decided by the court on a motion for summary judgment. Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr., 692 F.3d 580, 587 (7th Cir. 2012).

In McFarland v. Gen. Am. Life Ins. Co., the Seventh Circuit interpreted the language of an occupational disability insurance policy with a definition of total disability similar to the definition contained in the Policy at issue here. 149 F.3d 583, 586 (7th Cir. 1998). The policy in McFarland defined total disability as when the insured is "unable to perform the material and substantial duties of [his or her] regular occupation." Id. The court held that the definition of total disability was unambiguous and that the insured would be totally disabled under the policy when he "cannot perform a sufficient number of his material and substantial duties and is therefore precluded from continuing the employment he undertook before the disability." Id. at 587.

Further, the court stated that "[t]he policy language could be interpreted reasonably to cover both qualitative and quantitative reductions in one's performance as a result of an injury or sickness." Id. at 588. A qualitative reduction would be one where the insured is "no longer able to perform one core and essential aspect of his job… as a result of an injury." Id. For instance, a shortstop, who could no longer perform the core and essential duty of throwing a baseball due to his disability, but could still run, hit, and catch, would be totally disabled due to a qualitative reduction in his performance. Id. In contrast, "a quantitative performance reduction would be one in which the injury or sickness would not physically prevent an employee from performing any given task, but the injury instead renders the person unable to perform enough of the tasks or to perform for a long enough period to continue working at his regular occupation." Id.

In Cheney v. Standard Ins. Co., the Seventh Circuit revisited its holding in McFarland, reiterating that the court had "rejected the notion that being unable to perform one task is always sufficient for total disability, unless that task is essential to performing the job as in the case of a shortstop unable to throw or a barber who lost a hand." 831 F.3d 445, 452 (7th Cir. 2016) (citing McFarland, 149 F.3d at 588).

6

The Court concludes that McFarland is controlling in this case. The language of the policy interpreted by the court in McFarland is sufficiently equivalent to the Policy at issue here. Thus, the Court must identify Plaintiff's important duties as president of Panatech prior to the Surgery and determine whether he has been unable to perform a sufficient number of these important duties, such that he has been precluded from serving as president of Panatech.

The Parties agree that Plaintiff's duties prior to the Surgery were sales, consulting/meetings, programming, and administrative work. There is also no dispute that Plaintiff has been affected by various ailments since the Surgery. Plaintiff argues that he satisfies the Policy's definition of Total Disability because his ailments have rendered him completely unable to perform his sales duty as he did prior to the Surgery. More specifically, Plaintiff contends that he has been unable to solicit and develop new business through in person presentations, meetings, sales pitches, and attending seminars. Thus, Plaintiff asserts he is totally disabled due to a qualitative reduction in performance. Conversely, Defendant argues that Plaintiff is not totally disabled because his ailments have not precluded him from serving as President of Panatech. The Court rejects Plaintiff's argument and agrees with Defendant for the following reasons.

First, Plaintiff's definition of his sales duty is overly narrow. Plaintiff testified at his deposition that prior the Surgery he would engage in selling to existing clients by fielding questions while on site so he "could write a little program that would automatically suck up whatever [the issue was] and [this] would generate new business." PRDSF ¶ 30, Ex. 2, Plaintiff's Deposition ("Pl.'s Dep.") at 130:23-131:6. Plaintiff undisputedly maintains the ability to perform this portion of his sales duty, as he testified at his deposition that he has been able make on site visits with clients on a weekly basis, have face-to-face meetings with clients, and engage in computer programming. Pl.'s Dep. at 129:6-18. Additionally, prior to the Surgery, Plaintiff hired a marketing company and sent promotional postcards to potential clients. Plaintiff argues that these tactics never generated any new clients, but the record reflects that the promotional postcards at least generated promising leads for

7

new clients. PRDSF ¶ 41, Ex. 5, Stevenson Deposition at 42:15-22. Nothing in the record supports that Plaintiff is unable to undertake these same sales activities.

Second, while the record reflects that Panatech has not gained any new clients since 2008, Panatech's 2013-2014 average gross profit was nearly 80 percent of its 2006-2007 average gross profit. Thus, the survival of Panatech, and Plaintiff's position as president, has not depended on Plaintiff's ability to bring in new clients through in person presentations, meetings, sales pitches, and attending seminars.

Plaintiff's argument attempts to narrowly redefine his occupation as something akin to a traveling salesman, rather than president of a small company. Plaintiff ignores that he generated revenue for Panatech through various sales activities, a number of which he undisputedly maintains the ability to perform. Moreover, no reading of the Policy shows that it was designed to guarantee a successful commercial operation. Accordingly, the Court agrees with Defendant. Plaintiff's sales duty, as he narrowly defines it, is not a core and essential aspect of Plaintiff's occupation, such that his purported inability to perform this duty has precluded him from serving as president of Panatech.

Further, Plaintiff's argument is undermined by his own admissions regarding his ability to undertake mentally and physically demanding activities. During his deposition, Plaintiff stated that he renewed his pilot's license and purchased an airplane in 2013, which he flies 75-80 hours per year. Pl.'s Dep. at 16:9-24:14. Plaintiff further stated that he was required to pass a medical exam when he renewed his pilot's license and he must pass a biannual medical exam to maintain his license. Id. at 18:7-14. According to Plaintiff, his plane is "useful for business," and he considers it to be a "networking vehicle." Id. at 245:13-20. Plaintiff also stated that in 2013 he wrote and published a book about the ForeFlight iPad application and presented a 90 minute seminar about the application. Id. at 25:23.

Moreover, Plaintiff admitted during his deposition that he is able to have weekly face-to-face meetings and communicate with clients via text, email, and phone. Id. at 129:6-18. Additionally, in

8

December 2013, Plaintiff reported to Defendant that once per week, he plays right defenseman in an adult hockey league. Finally, in March 2014, after Defendant terminated Plaintiff's Total Disability benefits, Plaintiff was able to conduct legal research and draft fourteen letters containing legal arguments.

Plaintiff fails to explain how he has been able to undertake these mentally and physically demanding activities, but has simultaneously been unable to develop new business through in person presentations, meetings, sales pitches, and attending seminars. The undisputed facts show that Plaintiff's ailments have made it more difficult for him to develop new business for Panatech, but not impossible as he contends. Thus, Plaintiff's diminished ability to generate new business may satisfy the Policy's definition of Residual Disability, but does not satisfy the Policy's definition of Total Disability. Plaintiff, however, waived his right to claim Residual Disability benefits.

### III. CONCLUSION

Given Plaintiff's extensive testimony and other admissions regarding his ability to engage in mentally and physically demanding activities, no reasonable jury could find that Plaintiff is totally disabled under the Policy. Further, Plaintiff's ability to perform the important duties of his occupation establishes that he cannot meet the Policy's definition of Total Disability. Accordingly, Plaintiff's Motion for Summary Judgment is denied and Defendant's Motion for Summary Judgment is granted.

ENTER: *[signature: Charles Norgle]*

CHARLES RONALD NORGLE, Judge
United States District Court

DATE: 9/14/2017